UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

JOHN LENTI,                                  :
          Plaintiff,                         :
                                             :
     v.                                      :     Case No. 3:20-cv-127 (SRU)
                                             :
STATE OF CONNECTICUT, et al.,                :
          Defendants.                        :

## REVIEW ORDER

John Lenti is a sentenced inmate in the custody of Connecticut's Department of

Correction (the "DOC"), and he is currently confined at the Cheshire Correctional Institution

("Cheshire").  On January 23, 2020, Lenti, proceeding *pro se*, filed this action as a petition

for a writ of mandamus against the State of Connecticut, the DOC, and four individual DOC

employees in their individual and official capacities:  Commissioner Rollin Cook, Cheshire

Warden Kenneth Butricks, Americans with Disabilities Act ("ADA") Compliance Officer

Colleen Gallagher, and Director of Officer Classification and Population Management David

Maiga.  *See* Compl., Doc. No. 1.

In an initial review order dated April 30, 2020, I construed Lenti's petition as a

request for preliminary injunctive relief—specifically, to enforce his rights under the ADA

and the Eighth Amendment.  *See* Initial Review Order, Doc. No. 23.  So construed, I

permitted Lenti's complaint to be served upon the State of Connecticut, the DOC, and—in

their official capacities—Commissioner Cook, Warden Butricks, Officer Gallagher, and

Director Maiga.  *See id.* at 10.[1]

---

[1]  However, I dismissed the Eighth Amendment claims against the State of Connecticut and DOC because neither defendant is a "person" subject to suit under section 1983.  *See* Initial Review Order, Doc. No. 23, at 8, 10.

In my initial review order, I also noted that Lenti had filed another case on February 3, 2020—*Lenti v. Ruiz, et al.*, No. 3:20-cv-156 (SRU)—that shared numerous common questions of law and fact with this action. *See id.* at 10. I concluded, therefore, that consolidation of the two cases was appropriate under Fed. R. Civ. P. 42(a). *See id.* at 10–11. Because the complaints in this case and in *Lenti v. Ruiz, et al.*, No. 3:20-cv-156 (SRU), were not identical, I afforded Lenti leave to file an amended complaint in this consolidated action to incorporate claims from the *Ruiz* action. *See id.* at 11. The *Ruiz* case was consolidated into this case on May 5, 2020. *See* Notice, Doc. No. 26. On May 21, Lenti filed an amended complaint. *See* Am. Compl., Doc. No. 28.

Lenti's amended complaint appears to restate his earlier complaint in this case nearly verbatim. *Compare* Compl., Doc. No. 1, at ¶¶ 1–14 *with* Am. Compl., Doc. No. 28, at ¶¶ 62–75. Because I have already addressed those claims in my Initial Review Order,[2] I need not address them again. Rather, this Review Order addresses the additional claims in Lenti's amended complaint.

In his amended complaint, Lenti asserts claims under 42 U.S.C. § 1983 and Title II of the ADA,[3] against the State of Connecticut, Commissioner Cook, Warden Butricks, Officer Gallagher, Director Maiga, Dr. Ricardo Ruiz, Counselor Supervisor Carbone, Counselor Supervisor/ADA Officer Cyr, and Correction Officer John Doe (together, the "Defendants").

---

[2] To recap: I concluded that Lenti had sufficiently alleged that the State of Connecticut, Commissioner Cook, Warden Butricks, Officer Gallagher, and Director Maiga were subjecting Lenti to a serious risk to his safety in violation of the Eighth Amendment by not providing a wheelchair and grab bars to enable Lenti to use the toilet and the sink. Initial Review Order, Doc. No. 23, at 10. I also concluded that Lenti had adequately alleged an ADA violation against the same defendants. *See id.* at 7–8.

[3] 42 U.S.C. §§ 12131, *et seq.*

*See* Am. Compl., Doc. No. 28, at 2.  For the following reasons, Lenti's amended complaint is **dismissed in part**.

## I.      Standard of Review

Under 28 U.S.C. § 1915A, I must review prisoners' civil complaints and dismiss any portion of those complaints that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief.  Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and grounds upon which they are based and to demonstrate a plausible right to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  Conclusory allegations are not sufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.     Factual Background

In 2015, Lenti was confined at Cheshire in the North Block housing unit.  On an unidentified date in 2015, the toilet in Lenti's cell broke.  *See* Am. Compl., Doc. No. 28, at ¶ 1.  Lenti informed Officer Doe that he needed a working toilet because he suffered from irritable bowel syndrome ("IBS").  *See id.*  Officer Doe refused to move Lenti to another cell with a working toilet.  *Id.* at ¶ 2.  Instead, Officer Doe provided Lenti with a bucket to use in place of

the toilet.  *See id.*  After Officer Doe left the housing unit, Lenti fell when he attempted to sit on the bucket and injured his back and neck.  *See id.* at ¶ 3.  Lenti's mother contacted the DOC to complain about the incident.  *See id.* at ¶ 5.  Officer Gallagher informed Lenti's mother that she did not believe that a corrections officer would engage in such behavior but that she would review the video footage.  *See id.*

Apparently also in 2015, Lenti filed a state habeas petition regarding his medical and disability needs.  *See id.* at ¶ 7.  In March 2016, the judge who presided over Lenti's state habeas petition—as well as prison officials, including Officer Gallagher, and a Connecticut disability rights advocate—agreed to arrange for Lenti's transfer to MacDougall Correctional Institution ("MacDougall") because MacDougall had designated housing units and recreation spaces that were fully accessible to inmates with physical disabilities and also offered a wellness program, an infirmary, and a recreation yard accessible to inmates with physical disabilities.  *See id.* at ¶¶ 7, 49.  Shortly thereafter, Lenti was moved to MacDougall; Lenti reports that, at MacDougall, "everything was great" and that it had "[e]verything that I was hoping for."  *Id.* at ¶ 8.  Lenti remained at MacDougall for over three years, until May 2019.  *See id.* at ¶¶ 8–9, 49–50.

After his arrival at MacDougall in 2016, a physician issued Lenti, who is obese, a medical pass for a double mattress.  *See id.* at ¶¶ 10, 13.  At some point, a new captain became the manager of Lenti's housing unit.  *See id.* at ¶ 10.  The new captain refused to honor the medical pass issued to Lenti for a double mattress, and Lenti was forced to sleep on a single mattress that was suitable only to hold 60 to 70 pounds.  *See id.* at ¶¶ 11, 13.  Sleeping on the single mattress "destroy[ed]" Lenti's back and hips, and he will require surgery.  *See id.* at ¶ 16.  Lenti filed his state habeas case in an effort to "honor [his] mattress pass."  *Id.* at ¶ 14.  At one

4

point in the state habeas proceedings, Officer Gallagher "perjured herself" by stating to the court that medical mattresses of the type Lenti desired (and had) did not exist. *Id.* at ¶ 15.

In mid-2019, Lenti was transferred to Osborn Correctional Institution ("Osborn"). *See id.* at ¶ 17. At Osborn, Lenti was confined in a handicapped-accessible unit. *See id.* Lenti observed that other inmates in the unit were using medical mattresses. *See id.* Lenti informed a doctor at Osborn that his medical conditions required a medical mattress. *See id.* at ¶ 18. That doctor evaluated Lenti and agreed that Lenti qualified for a medical mattress. *See id.* When Lenti spoke with Officer Gallagher, she commented that if Lenti received a medical mattress, every inmate would request one. *See id.* at ¶ 19.

On an unidentified date during Lenti's confinement at Osborn, another inmate planted a razor blade under Lenti's bunk and informed officers that Lenti possessed a weapon: It was a "set up." *See id.* at ¶ 20. Lenti was placed in the segregation unit. *See id.* Upon Lenti's release from the segregation unit, Officer Cyr placed Lenti in a cell in general population even though she knew that Lenti required a handicapped-accessible cell. *See id.* at ¶¶ 21–22. The housing unit in which Lenti was confined did not have handicapped-accessible showers. *Id.* at ¶¶ 22–23. As a result, Lenti did not shower for nine days. *Id.* at ¶ 23. Lenti contacted a Connecticut Disabilities Rights advocate and a Connecticut Department of Public Health investigator to call the DOC on his behalf. *Id.* at ¶ 23. After those individuals made that call, prison officials at Osborn permitted Lenti to use a different shower, but that shower "still ha[d] no handicap amenities." *See id.* at ¶¶ 23–24. Thus, Lenti asked the advocate and investigator to call the DOC again, which they did. *See id.* at ¶ 24. Later that day, Officer Cyr informed Lenti that she was upset that he had contacted "outside" officials to report on her conduct as well as the actions of

the DOC and informed Lenti that he would be transferred to another facility.  *See id.* at ¶ 25.
The next morning, Lenti was transferred from Osborn to Carl Robinson Correctional Institution
("Carl Robinson").  *See id.*

The warden at Carl Robinson made it known to Lenti that she was not happy that he had
been transferred to her facility and indicated that, if he contacted any "outside sources," he
would be transferred to another facility.  *See id.* at ¶¶ 26, 29.  At Carl Robinson, Lenti was
confined in a cell in a unit that was fully accessible to inmates with physical disabilities.  *See id.*
at ¶ 32.  One night, Lenti raised his cane at another inmate who "would not stop bullying me"
and "kept poking me."  *See id.* at ¶¶ 33–34.  Lenti told that inmate to "back off."  *See id.* at ¶ 34.
A corrections officer observed Lenti raise his cane and issued Lenti a disciplinary report for
"horseplay."  *Id.* at ¶ 35.  According to Lenti, this was another "set up."  *See id.* at ¶ 36.  Lenti
was moved briefly to another non-handicapped-accessible unit at Carl Robinson and then into
the segregation unit for seven days.  *See id.* at ¶¶ 36–37.

On September 11, 2019, after Lenti had completed his segregation, prison officials at
Carl Robinson transferred Lenti to MacDougall.  *See id.* at ¶ 38.  At MacDougall, prison officials
issued Lenti the medical mattress that he had requested as part of his state habeas relief.  *See id.*
Lenti believes that the delay in obtaining that mattress was borne "out of spite by" Officer
Gallagher.  *See id.* at ¶ 40.  In any event, in either September or October 2019,[4] prison officials at
MacDougall transferred Lenti to Cheshire.  *See id.* at ¶¶ 41, 67.  Cheshire is not a medical
facility and has no handicapped amenities, exercise programs or recreational activities, and no
twenty-four-hour doctor.  *Id.* at ¶ 48.  Indeed, the physician assigned to Cheshire comes to the

---

[4] Lenti's timeline seems to suggest both.  *Compare* Am. Compl., Doc. No. 28, at ¶ 41 (suggesting October)
*with id.* at ¶¶ 50, 67 (suggesting mid-September).

facility only on Tuesdays for half a day, and if an inmate requires medical treatment or attention at any other time, prison officials must call an ambulance for treatment. *See id.*

Lenti has numerous complaints about his medical treatment during the time he has been at Cheshire. For instance, Lenti complains that the DOC has not replaced Lenti's back brace (allegedly lost in 2016) that the state habeas judge had ordered should be provided to Lenti. *See id.* at ¶¶ 46–47. For two-and-a-half years, Lenti has also walked without his right foot brace. *See id.* Upon arrival at Cheshire, officials provided Lenti a walker that did not have wheels or rubber feet (which Lenti views as dangerous) and refused to provide Lenti a wheelchair. *See id.* at ¶¶ 55, 57. The Cheshire wheelchair ramps are non-ADA compliant and too steep. *See id.* at ¶ 56. Lenti suffers from three herniated discs, sciatica and arthritis in his hands, back and legs and has received no medication to relieve those chronically painful conditions. *See id.* at ¶¶ 54, 61. Lenti fell off the toilet because there were no grab bars and spent five hours at the University of Connecticut Health Center. *See id.* at ¶ 54. That fall aggravated his existing back condition, but Lenti received no pain medication. *See id.* at ¶¶ 54, 58. Further, since his arrival at Cheshire, Lenti's cell has been unheated. *See id.* at ¶ 59. In response to Lenti's complaints regarding the lack of heat, Warden Butricks laughed and refused to provide Lenti with an extra blanket. *Id.* at ¶ 60.

Lenti has written to Officer Gallagher, Warden Butricks, Dr. Ruiz, Director Maiga, Counselor Supervisor Carbone, and three non-defendants about his situation and the violations of his rights under the ADA. *See id.* at ¶ 41. Lenti has made every attempt to be transferred from Cheshire. *Id.* at ¶ 53. In response to one of his requests, Warden Butricks suggested that Lenti "sue DOC, everyone does." *Id.* Lenti requests various injunctive measures as relief, but he also

requests "[d]amages for deliberate indifference to health and safety, in violation of the" Eighth

and Fourteenth Amendments and the ADA.  *See id.* at 24.

## III.    Discussion

### A.    The Law

#### 1. *ADA*

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132.  To establish a violation of Title II of the ADA, a plaintiff must

show "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from

participation in a public entity's services, programs or activities or was otherwise discriminated

against by a public entity; and (3) that such exclusion or discrimination was due to his

disability."  *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir. 2003) (cleaned up).

State prisons qualify as public entities under the ADA, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S.

206, 210 (1998), and "[T]itle II applies to anything a public entity does."  28 C.F.R. § Pt. 35,

App. B (2011).

A "qualified individual with a disability" is defined as a disabled individual "who, with

or without reasonable modifications to rules, policies, or practices, the removal of architectural,

communication, or transportation barriers, or the provision of auxiliary aids and services, meets

the essential eligibility requirements for the receipt of services or the participation in programs or

activities provided by a public entity."  42 U.S.C. § 12131(2).  The ADA further defines

"disability" as "(A) a physical or mental impairment that substantially limits one or more of the

major life activities of such individual; (B) a record of such an impairment; or (C) being regarded

as having such an impairment (as described in paragraph (3))."  42 U.S.C. § 12102(1).

    *2.  Eighth Amendment*

    To state a claim under section 1983, a plaintiff must plausibly allege that a person acting

under color of state law deprived him of a federally protected right.  *See* 42 U.S.C. § 1983; *Lugar*

*v. Edmonson Oil Co.*, 457 U.S. 922, 924 (1982).  The State of Connecticut is not a "person"

subject to suit under section 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71

(1989); *Smith v. Conn. Dep't of Corr.*, 2014 WL 3824357, at *6 (D. Conn. Aug. 4, 2014).  Thus,

to the extent that Lenti asserts any Eighth Amendment claim against the State of Connecticut

directly, I dismiss those claims.  *See* 28 U.S.C. § 1915A(b).

    When a party sues a state official in his or her official capacity, "a federal court's

remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective

injunctive relief . . . and may not include a retroactive award which requires the payment of

funds from the state treasury."  *Edelman v. Jordan,* 415 U.S. 651, 677 (1974); *Ex parte Young*,

209 U.S. 123, 155–56 (1908).  When a party sues a State or its agencies directly—and if the

State has not waived (or Congress has not abrogated) its sovereign immunity—"the Eleventh

Amendment bars a federal court from granting any relief on that claim."  *Pennhurst State Sch. &*

*Hosp. v. Halderman,* 465 U.S. 89, 120 (1984).

    Although the Constitution does not require "comfortable" prison conditions,

the Eighth Amendment imposes certain duties on prison officials to "ensure that inmates receive

adequate food, clothing, shelter and medical care," and that prison officials "take reasonable

measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832–33

(1994) (cleaned up). To state a deliberate indifference to health or safety claim under

the Eighth Amendment, an inmate must demonstrate both an objective and a subjective element.

To meet the objective element, an inmate must allege that he was incarcerated under

conditions that resulted in a "sufficiently serious" deprivation, such as the denial of "the minimal

civilized measure of life's necessities" or a "substantial risk of serious harm." *Id.* at 834 (cleaned

up). To meet the subjective element, an inmate must allege that the defendant prison officials

possessed culpable intent, that is, the officials knew that he faced a substantial risk to his health

or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837. Thus,

an allegation of merely negligent conduct is insufficient. *Id.* at 835. Rather, the subjective

element requires that a plaintiff allege that prison officials acted with "a mental state equivalent

to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d

263, 280 (2d Cir. 2006). When evaluating a claim for failure to protect an inmate from harm or

deliberate indifference to inmate safety, the court considers "the facts and circumstances of

which the official was aware at the time he acted or failed to act." *Hartry v. Cty. of Suffolk*, 755

F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (cleaned up).

   B.  Lenti's Claims

      1.  *Cheshire (2015)*

      Lenti alleges that on an unidentified date in 2015 at Cheshire, Officer Doe provided him

with a bucket to urinate and defecate in rather than moving him to another cell with a working

toilet. Later that day, Lenti attempted to use the bucket and fell. Lenti claims to have hurt his

back and neck. A medical staff member evaluated Lenti and released him to his housing unit

later that day. Officer Gallagher subsequently became aware of the alleged conduct of Officer

Doe and agreed to review video footage of the incident.  In March 2016, Officer Gallagher and other officials agreed to transfer Lenti to MacDougall because MacDougall was equipped with handicapped-accessible cells, showers and toilets and could better accommodate Lenti's needs.

It is unclear whether Lenti intends to assert a claim for deliberate indifference against Officer Gallagher in connection with this incident.  Lenti simply alleges that Officer Gallagher became aware of the incident; that she found it difficult to believe that Officer Doe would have given Lenti a bucket to use as a toilet; and that she agreed to review the video footage of the incident.  Lenti includes no other facts regarding the outcome of any investigation into the incident.  Nor does Lenti allege that Officer Gallagher failed to take steps to accommodate his need for a working toilet at any time after the incident.  In fact, Lenti suggests that Officer Gallagher agreed to his transfer to MacDougall in March 2016 because MacDougall was a handicapped-accessible facility that could better accommodate Lenti's needs.  The facts (as alleged) do not support a claim that Officer Gallagher was deliberately indifferent to a risk of harm to Lenti's safety or health or that Officer Gallagher excluded Lenti from participation in the DOC's services.  Thus, to the extent that Lenti asserts an Eighth Amendment or ADA claim against Officer Gallagher in connection with the incident involving Officer Doe in 2015, those claims are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

I also dismiss Lenti's Eighth Amendment and ADA claims against Officer Doe because those claims are time-barred.  Although the statute of limitations ordinarily is an affirmative defense, I may raise the issue *sua sponte* "where 'the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.'"  *Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) (quoting *Leonhard v. United*

*States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980)); *see also Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (holding that a district court may dismiss a complaint on initial review based on a defense, such as the statute of limitations, that appears on the face of the complaint).  The statute of limitations applicable to section 1983 and ADA claims is three years.  *See* Conn. Gen. Stat. § 52–577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) ("[A] state's personal-injury statute of limitations . . . should be applied to all § 1983 claims."); *Dervishi v. Holland*, 2015 WL 3948972, at *2 (D. Conn. June 29, 2015) (ADA); *M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 175, 193 (D. Conn. 2008); *Duprey v. Conn. Dep't of Motor Vehicles,* 191 F.R.D. 329, 341 (D. Conn. 2000).  It is "especially appropriate" to dismiss a plaintiff's claim on the basis of the statute of limitations where "the injuries complained of occurred more than five years before the filing of the complaint . . . , there are no applicable tolling provisions as a matter of law, and plaintiff has alleged no facts indicating a continuous or ongoing violation of his constitutional rights."  *Pino*, 49 F.3d at 54 (cleaned up).

In determining whether an action is barred by the statute of limitations, a federal cause of action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013) (cleaned up).  Lenti was, of course, aware of the incident involving the broken toilet at the time it occurred in 2015.  Thus, on December 31, 2015, at the very latest, Lenti knew or "ha[d] reason to know of the injury which is the basis of" his ADA and section 1983 claim.  Lenti did not file this case until February 3, 2020, which was over four years later (and possibly over five years later).

Rules regarding "tolling" of statutes of limitations are governed by state law.  *Schmidt v.*

*Devino*, 106 F. Supp. 2d 345, 350 (D. Conn. 2000).  Connecticut law permits tolling of the statute of limitations due to a continuous course of conduct or fraudulent concealment of the cause of action by the defendants.  *See Macellaio v. Newington Police Dep't*, 145 Conn. App. 426, 429 (2013).  To establish the existence of a continuing course of conduct, a plaintiff must provide evidence that the defendant:  (1) engaged in wrongful conduct against the plaintiff; (2) owed the plaintiff a continuing duty that was related to the alleged initial misconduct; and (3) continually breached that duty by engaging in subsequent misconduct towards the plaintiff.  *See Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 311–13 (2014) (cleaned up). Connecticut courts have concluded that a duty may continue to exist when "there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act."  *Id.* at 312–13 (cleaned up) (quoting *Watts v. Chittenden*, 301 Conn. 575, 584 (2011)).  To prove fraudulent concealment, a plaintiff must show:  "(1) the defendants' actual awareness . . . of the facts necessary to establish the plaintiff's cause of action; (2) the defendants' intentional concealment of these facts from the plaintiff; and (3) the defendants' concealment of these facts was for the purpose of obtaining delay on the plaintiff's part in filing a complaint on his cause of action." *Macellaio*, 145 Conn. App. at 432–33 (citing *Bartone v. Robert L. Day Co.*, 232 Conn. 527, 533 (1995)).

Lenti has not alleged any facts that would support tolling on the basis of either (1) fraudulent concealment or (2) a continuous course of conduct.  Once Lenti was transferred to MacDougall in March 2016, any special relationship that may have existed between Lenti and Officer Doe at Cheshire ceased.  Moreover, no facts suggest that Officer Doe engaged in any

further misconduct or had any further contact with Lenti after Lenti's March 2016 transfer from Cheshire to MacDougall.  Furthermore, no facts suggest that Officer Doe owed a continuing duty to Lenti based on the alleged wrongful conduct of any other defendant that occurred during the limitations period and that is related to the incident involving Officer Doe in 2015.  Finally, Lenti has alleged no facts to suggest that Officer Doe intentionally concealed any fact from Lenti. Accordingly, Lenti's Eighth Amendment and ADA claims asserted against Officer Doe are barred by the statute of limitations and are dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

2.   *Osborn (2019)*

Lenti alleges that prison officials at MacDougall transferred him to Osborn in May 2019. Although Lenti was initially housed in a unit that had handicapped-accessible cells and showers, at some point—after Lenti served time in the segregation unit—Officer Cyr allegedly discriminated against Lenti by placing him in a cell in a housing unit that was not handicapped-accessible.  Lenti was allegedly unable to shower for nine days because there was no handicapped-accessible shower in his housing unit.  A disability rights advocate and public health investigator, after being contacted by Lenti, allegedly intervened on Lenti's behalf, and prison officials at Osborn permitted Lenti to shower in a handicapped-accessible shower in Hospital 3 Dorm.  Lenti contends that Officer Cyr violated his rights under the ADA and the Eighth Amendment.

i.    Lenti Has Not Stated a Claim Under the Eighth Amendment.

Under the Eighth Amendment, inmates have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene.  *See Walker v. Schult,* 717 F.3d 119, 127 (2d Cir. 2013) (citing cases for the proposition that "the failure to provide prisoners with

14

toiletries and other hygienic materials may rise to the level of a constitutional violation"). A "denial of showers rises to the level of an Eighth Amendment violation when such a denial deprives the prisoner of basic human needs." *Dillon v. City of N.Y.*, 2013 WL 3776167, at *2 (S.D.N.Y. July 18, 2013). However, courts in this Circuit have clearly held that denials of access to a shower for up to two weeks—longer than the denial in this case—do not objectively rise to the level of a serious deprivation of a basic human need. *See, e.g.*, *Crichlow v. Fischer*, 2017 WL 6466556, at *15 (N.D.N.Y. Sept. 5, 2017) ("[T]he denial of showers for as long as two weeks is not sufficiently serious to state a constitutional claim."); *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("[A] two-week suspension of shower privileges does not suffice as a denial of basic hygienic needs.") (cleaned up); *Cruz v. Jackson,* 1997 WL 45348, at *7 (S.D.N.Y. Feb. 5, 1997) ("Cruz's allegation that he was deprived of a shower for two weeks does not satisfy the objective component of an Eighth Amendment claim.").

Because Lenti has asserted only that he was deprived of access to a shower for nine days, Lenti has failed to assert facts to support a plausible claim that he suffered an objectively serious deprivation of a human need or life necessity. Thus, Lenti has not met the objective component of an Eighth Amendment claim, and Lenti's Eighth Amendment conditions of confinement claim against Officer Cyr is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

ii.     Lenti Has Not Stated a Claim Under the ADA.

As an initial matter, Lenti may not bring a claim pursuant to Title II of the ADA against a state actor in her individual capacity. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir. 2001). Accordingly, I dismiss the ADA claim asserted against Officer Cyr in her individual capacity because it fails to state a claim upon which relief may be

granted.  *See* 28 U.S.C. § 1915A(b)(1).  On the other hand, Lenti may assert a Title II ADA claim against a state actor in her official capacity for prospective injunctive relief.  *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  However, Lenti is no longer confined at Osborn, and so he cannot seek injunctive relief regarding the conditions of his confinement at Osborn.  *See Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.").

Under certain circumstances, an inmate may assert a Title II ADA claim for money damages against a state actor in her official capacity.  *See United States v. Georgia*, 546 U.S. 151, 159 (2006); *see also Goonewardena v. New York*, 475 F. Supp. 2d 310, 323, 326 (S.D.N.Y. 2007).  That is unusual because, in the normal course, States enjoy sovereign immunity from suit pursuant to the Eleventh Amendment.  That is, courts have interpreted the Eleventh Amendment to prohibit a citizen of a State from suing a State or its agencies for money damages in federal court; that prohibition "extends to damage actions against state employees acting in their official capacities."  *Cole v. Goord*, 2009 WL 2601369, at *5 (S.D.N.Y. Aug. 25, 2009) (citing *Hans v. Louisiana*, 134 U.S. 1 (1890); *Pennhurst*, 465 U.S. at 98–99).

Congress, though, may abrogate a State's sovereign immunity from suit.  *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54 (1996).  "To do so, Congress must (1) make its intention to abrogate unmistakably clear in the language of the statute and (2) act pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment."[5]  *Cole*, 2009 WL 2601369, at *5 (cleaned up) (quoting *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003)).  In enacting the ADA, Congress clearly satisfied the first criterion.  *See* 42 U.S.C. § 12202 ("A State shall not be

---

[5]  Section five of the Fourteenth Amendment reads:  "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  U.S. Const. amend. XIV.

immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."). Whether Congress satisfied the second criterion is a more complicated consideration, and the answer varies from case to case. *See Cox v. Mass. Dep't of Corr.*, 2018 WL 1586019, at *9 (D. Mass. Mar. 31, 2018) ("Abrogation of sovereign immunity under Title II is determined on a claim-by-claim basis.").

To determine whether Congress validly exercised its enforcement power under section five of the Fourteenth Amendment and abrogated Connecticut's sovereign immunity with respect to Lenti's particular claim against Officer Cyr, I must conduct a three-part test.[6] First, I must determine "which aspects of the State's alleged conduct violated Title II." *Georgia*, 546 U.S. at 159. Second, I must determine "to what extent such misconduct also violated the Fourteenth Amendment." *Id.* If the State's alleged conduct did violate the Fourteenth Amendment, it could proceed. *See Georgia*, 546 U.S. at 159 ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."). Finally, if the State's "misconduct violated Title II but did not violate the Fourteenth Amendment," I must determine "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* For claims that fall into the last category, I must determine whether there is a "congruence and

---

[6] Some district courts in this Circuit do not apply this test and, instead, rely on *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir. 2001), in holding that to recover money damages in a suit under Title II of the ADA, a "plaintiff must show a violation of Title II motivated by either discriminatory animus or ill will stemming from the plaintiff's disability." *Dean v. Univ. at Buffalo School of Medicine and Biomedical Scis.*, 804 F.3d 178, 193–94 (2d Cir. 2015) (cleaned up) (noting the disagreement among lower courts in this Circuit); *Cole v. Goord*, 2009 WL 2601369, at *7 (S.D.N.Y. Aug. 25, 2009) (same). However, in *Dean*, the Second Circuit noted that "[s]ubsequent Supreme Court precedent concerning the constitutionality of Congress's abrogation of Eleventh Amendment immunity under Title II calls *Garcia*'s validity into question." *Dean*, 804 F.3d at 194. I agree with the district courts that apply the three-part test contemplated by *United States v. Georgia*, 546 U.S. 151, 159 (2006).

proportionality between the injury to be prevented or remedied and the means adopted to that end." *Tennessee v. Lane*, 541 U.S. 509, 520 (2004) (cleaned up) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)).  That standard is further elucidated below.

In my view, Lenti passes the first part of the *Georgia* test because he has plausibly alleged that Officer Cyr's denying him access to a handicapped-accessible shower for nine days violated Title II of the ADA.  Lenti alleges that he suffers from three herniated discs, sciatica, arthritis in his hands, back and legs, and IBS.  Construing Lenti's allegations liberally, I conclude that he is a "qualifying individual" within the meaning of Title II because his back injury and arthritis substantially limit him in his major life activities of standing, sitting, and caring for himself.  Thus, Lenti has met the first element of a Title II ADA claim.  Because the Department of Correction is an entity that is subject to the ADA, Lenti has met the second element of a Title II ADA claim.  *See Yeskey*, 524 U.S. at 209.  "A qualified individual can base a discrimination claim under Title II of the ADA on one of three available theories:  (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation."  *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2003) (cleaned up).  With respect to a reasonable accommodation claim, "the relevant inquiry asks not whether the benefits available to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003).

Lenti has plausibly alleged that Officer Cyr failed to make a reasonable accommodation. A prison's provision of accessible bathroom facilities is a "service, program, or activity" within the meaning of the ADA.  *See, e.g. Cabassa v. Oshier*, 2012 WL 7784980, at *18 (N.D.N.Y.

18

Oct. 30, 2012) ("Cabassa alleged that he was denied the use of accommodating showers and transfer to a facility where accommodations are more readily available, both of which constitute a denial of benefits of services or programs by the state."), *report and recommendation adopted in part, rejected in part on other grounds,* 2013 WL 1183296 (N.D.N.Y. Mar. 21, 2013).  Lenti alleges that, during his confinement at Osborn, he could not use the non-handicapped-accessible shower without risking injury because of his disability.  Still, Officer Cyr refused to provide Lenti with a reasonable accommodation in the form of a handicapped-accessible shower stall with grab bars.  Thus, Lenti has alleged a Title II ADA claim based on Officer Cyr's failure to make a reasonable accommodation for him that would enable him to use a handicapped-accessible shower.

Next, I must determine whether Officer Cyr's conduct also violated the Fourteenth Amendment.  It did not.  Pursuant to the Fourteenth Amendment, states may neither "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  Many rights that individuals have with respect to the federal government—including the Eighth Amendment right to be free from cruel and unusual punishments—have been incorporated against the States through the Fourteenth Amendment's due process clause.  *See, e.g.*, *Robinson v. Cal.*, 370 U.S. 660 (1962) (Eighth Amendment's prohibition against cruel and unusual punishment).  The only constitutional claim possibly implicated by Lenti's allegations against Officer Cyr is one based on the Eighth Amendment.  However, I have already explained why Officer Cyr's conduct objectively did not rise to the level of an Eighth Amendment violation.

Because Lenti plausibly alleges that Officer Cyr's conduct "violated Title II but did not

violate the Fourteenth Amendment," I must consider "whether Congress's purported abrogation of sovereign immunity" regarding Officer Cyr's conduct in this case "is nevertheless valid." *Georgia*, 546 U.S. at 159.  In making that determination, I apply the tripartite "congruence and proportionality" test from *City of Boerne*.  *See, e.g.*, *Goonewardena*, 475 F. Supp. at 323. According to that test, I should first "identify with some precision the scope of the constitutional right at issue."  *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001).  Next, I should "examine whether [in enacting the ADA] Congress identified a history and pattern of unconstitutional discrimination by the States against the disabled."  *See id.* at 368–69.  Finally, I should consider "whether the rights and remedies created by the [ADA] are congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress."  *Goonewardena*, 475 F. Supp. 2d at 323 (citing *Garrett*, 531 U.S. at 372).

With respect to step (1), I have already noted that the constitutional right at issue is Lenti's right under the Eighth Amendment (as incorporated against the States through the Fourteenth Amendment) to be free from cruel and unusual punishments.  I acknowledge that courts have held that Title II implicates more constitutional rights than just the right at issue in this case.[7]  But, Lenti has asserted only an Eighth Amendment claim.  *Cf. Cox*, 2018 WL 1586019, at *12 (construing the constitutional right at issue in that case as only an Eighth Amendment claim).

---

[7]  *See, e.g.*, *Wilke v. Cole*, 2014 WL 7237019, at *7 (E.D. Wis. Dec. 17, 2014) ("Title II clearly implicates the Eighth Amendment and the equal protection rights of the Fourteenth Amendment . . . .  Additionally, Title II implicates a 'constellation of rights applicable in the prison context,' *Georgia*, 546 U.S. at 161 (Stevens, J.[,] concurring), including the due process guarantees of the Fourteenth Amendment and the First Amendment rights to the free exercise of religion and free speech.").

With respect to step (2), several courts have interpreted *Tennessee v. Lane*, 541 U.S. 509 (2004), as "conclusively establishing that Title II as a whole survives the historical inquiry under the second step of the *City of Boerne* test." *Wilke v. Cole*, 2014 WL 7237019, at *7 (E.D. Wis. Dec. 17, 2014); *see also Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005); *Miller v. King*, 384 F.3d 1248, 1271 n.25 (11th Cir. 2004), *opinion vacated and superseded by* 449 F.3d 1149 (11th Cir. 2006); *Cochran v. Pinchak*, 401 F.3d 184, 191 (3d Cir. 2005), *reh'g granted and judgment vacated by* 412 F.3d 500 (3d Cir. 2005); *see also Chase v. Baskerville*, 508 F. Supp. 2d 492, 500 (E.D. Va. 2007) (defining the inquiry broadly as "whether Title II represents a legislative response to a pattern of unconstitutional disability discrimination in public services, programs, or activities generally") (cleaned up) (quoting *Constantine*, 411 F.3d at 487). I agree because the *Lane* Court catalogued such widely varying examples when noting that Title II was "designed to address . . . a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities." *Lane*, 541 U.S. at 524–25 (listing areas such as voting, marrying, public education, the penal system, the administration of justice, jury service, unjustified commitment, abuse and neglect of those committed to state mental hospitals, and zoning decisions).

However, Lenti's claim fails at step three. Here, I "must determine whether Title II is an appropriately tailored response in light of its object of enforcing the . . . rights identified under step one and the history and pattern of unequal treatment identified under step two." *Wilke*, 2014 WL 7237019, at *7. The Supreme Court has cautioned:

> While § 5 [of the Fourteenth Amendment] authorizes Congress to enact reasonably prophylactic remedial legislation, the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent. Difficult and intractable problems often require powerful remedies, but it is also true that strong measures appropriate to

address one harm may be an unwarranted response to another, lesser one.

*Lane*, 541 U.S. at 523–24 (cleaned up).

Numerous courts evaluating Title II ADA claims by state prisoners have found that the prisoners' claims "fail[] the third step of the *City of Boerne* test because," in that context, Title II "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Wilke*, 2014 WL 7237019, at *7 (cleaned up) (quoting *City of Boerne*, 521 U.S. at 532); *see also Phelan v. Thomas*, 2017 WL 519246, at *5 (N.D.N.Y. Feb. 8, 2017); *Baskerville*, 508 F. Supp. 2d at 506; *Belk v. Smith*, 2013 WL 5430426, at *8–9 (M.D.N.C. Sept. 27, 2013). Some of those courts emphasize the broad scope of Title II of the ADA. *See, e.g.*, *Wilke*, 2014 WL 7237019, at *7 (noting that "Title II's prophylactic demand for reasonable accommodation requires far more than does the Constitution" because it "prohibits far more state conduct and in many more areas of prison administration than conceivably necessary to enforce any relevant constitutional rights") (cleaned up). Many of those courts also point out that federal courts should be especially cautious before interfering with the administration of a State's prison system. *See, e.g.*, *Belk*, 2013 WL 5430426, at *8 (citing, *inter alia*, *Turner v. Safley*, 482 U.S. 78, 85, 89 (1987); *Woodford v. Ngo*, 548 U.S. 81, 94 (2006); *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973)); *Shaw v. Pa. Dep't of Corr.*, 2018 WL 6831148, at *6 (W.D. Pa. Dec. 28, 2018); *Meeks v. Schofield*, 10 F. Supp. 3d 774, 797 (M.D. Tenn. 2014); *see also Reynolds v. Cook*, 2020 WL 1140885, at *13 (D. Conn. Mar. 9, 2020).

Lenti's claim fails because the violation that he alleges is so far afield from the essence of the Eighth Amendment's prohibition against cruel and unusual punishments. In other words,

Lenti's claim that he was deprived of access to a handicapped-accessible shower for nine days

alleges, in my view, a *de minimis* violation of his rights under the ADA.  Other courts that have

rejected states prisoners' Title II ADA claims on the grounds of sovereign immunity (for failing

the third *City of Boerne* criterion) have done so for alleged violations that are at least as serious

as the one Lenti alleges here.  *See, e.g.*, *Wilke*, 2014 WL 7237019, at *1, *7 (prisoner alleged he

had been denied, for years, single-cell status and a drug-testing accommodation based on his

paruresis—a difficulty "urinat[ing] in the real or imaginary presence of others"); *Phelan*, 2017

WL 519246, at *2, *5 (prisoner alleged he had been denied mental health treatment, access to the

law library, and had been prevented from filing grievances); *Belk*, 2013 WL 5430426, at *1, *9

(prisoner felt he was denied prison work opportunities because of a disability); *Shaw*, 2018 WL

6831148, at *4 (same); *Meeks*, 10 F. Supp. 3d at 795 (prisoner alleged his transfer to different

unit based on his disability disadvantaged him by excluding him from participation in certain

prison services).  Thus, Officer Cyr (in her official capacity) has sovereign immunity from

Lenti's Title II ADA claim, and I dismiss that claim.

        iii.    First Amendment – Retaliatory Transfer Claim

      Lenti alleges that after he received a pass to shower in the hospital dorm, he continued to

experience a lack of other "handicap amenities."  Thus, he again contacted the disabilities rights

advocate and the health department investigator, who allegedly called and "threatened" the

warden at Osborn.  Later that day, Officer Cyr informed Lenti that she was upset about the call

and that Lenti would be transferred from Osborn to another facility.  Indeed, that evening, Lenti

was transferred to Carl Robinson.  I construe Lenti's allegations as asserting retaliation claims

against Officer Cyr under the First Amendment and the ADA.

Because claims of retaliation are easily fabricated, courts consider such claims with skepticism and require that a plaintiff support them with specific facts. Thus, conclusory statements are not sufficient to support a First Amendment retaliation claim. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). To state a First Amendment retaliation claim, a plaintiff must allege facts showing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* at 294 (cleaned up). A plaintiff also may assert a retaliation claim under the ADA. In particular, the ADA prohibits discrimination (in the form of retaliation) against any individual who "has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). To state such a claim, a plaintiff must show that: (1) he engaged in an activity protected by the ADA; (2) the defendant was aware of his conduct; (3) the defendant took adverse action against him; and (4) a causal connection exists between the protected conduct and the alleged adverse action of the defendant. *See Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002).

Lenti has not plausibly pled a retaliation claim under either the First Amendment or the ADA. Lenti has, arguably, alleged that he engaged in protected conduct when he contacted the disability rights advocate and public health investigator to alert them about Officer Cyr's conduct. Under the ADA, such an informal verbal complaint may qualify as a protected activity. *See Treglia*, 313 F.3d at 720 (citing cases). For purposes of the First Amendment, it is less clear whether such informal verbal complaints may rise to the level of protected speech. *See Patterson v. Patterson*, 2019 WL 1284346, at * 8 (W.D.N.Y. Mar. 20, 2019) (cleaned up)

24

("While courts in this Circuit have found that verbal complaints may be protected for the purposes of a First Amendment retaliation claim, the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate.").

I need not resolve that dispute because—even if Lenti has engaged in protected speech within the meaning of the First Amendment—Lenti's claim stumbles at the next hurdle.  In particular, Lenti has not alleged facts sufficient to establish the second element of a First Amendment retaliation claim or the third element of an ADA retaliation claim.  Lenti alleges that, upon his transfer to Carl Robinson, he was placed in a fully handicapped-accessible housing unit.  Thus, he has not alleged that the transfer was an action that affected him adversely.  *See, e.g.*, *Warren v. Goord*, 2008 WL 5077004, at *2 (2d Cir. Nov. 26, 2008) (holding that inmate had not met adverse action element of either First Amendment or ADA retaliation claim "[b]ecause the conditions in the . . . infirmary to which Warren was transferred, which constituted the alleged retaliation, were substantially similar to the conditions under which Warren was held prior to his transfer"); *Lebron v. Semple*, 2018 WL 3733972, at *6 (D. Conn. Aug. 6, 2018) ("Plaintiff's allegations do not state a plausible claim for First Amendment retaliation, because there are no facts alleged to suggest that the transfer [from Cheshire to Osborn] was adverse to him."); *Rosen v. Pallito*, 2017 WL 6513663, at *7 (D. Vt. Dec. 19, 2017) ("[A] mere transfer without a corresponding deprivation of privileges does not rise to the level of retaliatory action.").

Because Lenti has not alleged facts sufficient to establish the *prima facie* elements of both his First Amendment and ADA retaliation claims, I dismiss those claims against Officer Cyr.  *See* 28 U.S.C. § 1915A(b)(1).

3. *Cheshire (2019) – ADA and Eighth Amendment Disability-Related Claims*

Lenti includes various allegations regarding his transfer to Cheshire in mid-September 2019 and his confinement there until the end of January 2020.  More specifically, Lenti alleges that there are no handicapped-accessible cells, sinks, showers, recreational areas and exercise programs at Cheshire.  In addition, Lenti explains that prison officials at Cheshire have denied Lenti access to assistive disability equipment, including a wheelchair, foot brace, and back brace. I have already permitted highly similar claims to proceed beyond initial review.  *See* Initial Review Order, Doc. No. 23, at 6–10.  Although Lenti's allegations in his original complaint filed in this matter did not specify his need for back or foot braces,[8] I construe his earlier request for injunctive relief to encompass a need for foot and back braces as assistive devices.  Thus, I allow those claims to proceed.

4. *Remaining Claims – Severed and Dismissed Without Prejudice*

In addition to the claims already addressed, Lenti also includes in his complaint allegations regarding numerous other incidences.  First, Lenti discusses the litigation of his claim for a double/medical mattress (the subject, in part, of a state habeas petition) after his transfer to MacDougall in 2016.  (That issue was apparently resolved on September 11, 2019.)  Lenti suggests that Officer Gallagher's refusal to approve his request for a medical mattress before September 11, 2019 violated Lenti's rights under the ADA.  Second, Lenti alleges that staff members at Cheshire, including Dr. Ruiz, were deliberately indifferent to his rights in violation

---

[8]  I note that Lenti has not alleged that any named defendant was involved or responsible for the failure to provide him with the back brace or foot brace.  Thus, Lenti cannot allege an Eighth Amendment claim for damages because there are no allegations that any defendant was personally involved in these deprivations.  *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (holding that a defendant's personal involvement in an alleged constitutional violation is a prerequisite to that defendant's liability for an award of damages under section 1983).

of the Eighth Amendment by not providing Lenti with pain medication from September 2019 to

January 2020.  Third, Lenti asserts that Warden Butricks was deliberately indifferent to his rights

under the Eighth Amendment by keeping his cell temperature much too cold since September

2019.  Fourth, Lenti claims that he has been subject to deliberate indifference to his rights under

the Eighth Amendment based on the unresponsiveness to his requests for medical treatment to

help address (a) herniated discs, (b) drop foot, and (c) bi-lateral carpal tunnel.

Multiple defendants may be joined in a single action only if "any right to relief is asserted

against them jointly, severally, or in the alternative with respect to or arising out of the same

transaction, occurrence, or series of transactions and occurrences . . . and any question of law or

fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2).  Courts

determine what constitutes the same transaction or occurrence "on a case by case basis."  *Kehr*

*ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008).  The

Second Circuit has observed, in the context of Fed. R. Civ. P. 13(a), that whether a counterclaim

arises out of the same transaction or occurrence as the original claim depends upon an

assessment of the "logical relationship" between the claims and a determination of whether the

"essential facts of the various claims are so logically connected that considerations of judicial

economy and fairness dictate that all the issues be resolved in one lawsuit."  *Harris v. Steinem*,

571 F.2d 119, 123 (2d Cir. 1978) (cleaned up).  Courts apply an analogous interpretation to the

terms transaction or occurrence as used in Rule 20(a)(2).  *See Abraham v. Am. Home Mortg.*

*Servicing, Inc.*, 947 F. Supp. 2d 222, 228 (E.D.N.Y. 2013).

If parties have been misjoined, a court may, upon motion or on its own, "drop a party" or

"sever any claim against a party."  *See* Fed. R. Civ. P. 21.  In deciding whether to sever a claim,

courts weigh the following factors:  whether "(1) the claims arise out of the same transaction or occurrence; (2) the claims present some common question of law or fact; (3) [] settlement of the claims or judicial economy would be facilitated; (4) prejudice would be avoided; and (5) different witnesses and documentary proof are required for the separate claims."  *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263 (D. Conn. 2012) (citing *Greystone Cmty. Reinv. Ass'n v. Berean Capital, Inc.*, 638 F. Supp. 2d 278, 293 (D. Conn. 2009)).

Although all of Lenti's claims arise within the context of Lenti's confinement at the DOC, the four sets of claims identified at the beginning of this section do not arise out of the same transaction or occurrence as Lenti's injunctive claims under the ADA and the Eighth Amendment for assistive devices (wheelchair, grab bars, back and foot braces) to help ensure Lenti's safety and access to Cheshire's prison facilities.  All of Lenti's claims are not reasonably related to each other, and the factual and legal theories related to each claim are not common to each other.  Different witnesses, testimony, and documentary evidence would be required to prove the separate sets of claims at trial.  Thus, the defendants and claims are not properly joined in this action, and the relevant factors favor severance and dismissal of these claims. *See Lindsay v. Semple*, 2019 WL 3317320, at *10–11 (D. Conn. July 24, 2019) (severing and dismissing without prejudice all unrelated claims as improperly joined) (citing *Wilson v. McKenna*, 2015 WL 1471908, at *6 (D. Conn. Mar. 31, 2015)).   If Lenti wishes to pursue those claims, he must do so by filing separate lawsuits.

## ORDERS

**(1)**     The only surviving claims in Lenti's amended complaint are slightly augmented versions of those that I identified in my first Initial Review Order.  *See* Initial Review Order,

Doc. No. 23, at 10 (¶ 1).  More specifically, I held that Lenti had sufficiently alleged that the State of Connecticut, Commissioner Cook, Warden Butricks, Officer Gallagher, and Director Maiga were subjecting Lenti to a serious risk to his safety in violation of the Eighth Amendment by not providing a wheelchair and grab bars to enable Lenti to use the toilet and the sink.  Initial Review Order, Doc. No. 23, at 10.  I also concluded that Lenti had adequately alleged an ADA violation against the same defendants.  *See id.* at 7–8.  In this review order, I allow Lenti's similar allegations regarding the denial of back and foot braces to proceed against the same defendants because they are so similar to the claims that I have already allowed to proceed.

Thus, Lenti's amended complaint, requesting preliminary injunctive relief based on alleged violations under the ADA and the Eighth Amendment, shall proceed against the State of Connecticut, the DOC, and, in their official capacities, Commissioner Rollin Cook, Cheshire Warden Kenneth Butricks, ADA Compliance Officer Colleen Gallagher, and Director of Officer Classification and Population Management David Maiga.[9]

**(2)**  Pursuant to 28 U.S.C. § 1915A(b), I **DISMISS** Lenti's Eighth Amendment and ADA claims against Officer Gallagher and Officer Doe in connection with the incident at Cheshire in 2015 involving Officer Doe's refusal to transfer Lenti to a cell with a working toilet; Lenti's Eighth Amendment conditions of confinement claim asserted against Officer Cyr; Lenti's ADA claim asserted against Officer Cyr in her individual and official capacities; and Lenti's retaliation claims under the First Amendment and Title V of the ADA against Officer Cyr.

Pursuant to Fed. R. Civ. P. 20 and 21, I **SEVER AND DISMISS WITHOUT PREJUDICE** Lenti's Eighth Amendment claim that Officer Gallagher refused to approve

---

[9]  The Defendants have already answered Lenti's amended complaint.  *See* Answer, Doc. No. 34.

Lenti's request for a medical mattress in a timely manner; Lenti's Eighth Amendment deliberate

indifference claim related to the alleged failure of medical staff members, including Dr. Ruiz, to

provide Lenti with pain medication for his various medical conditions during his confinement at

Cheshire from September 2019 to January 2020; Lenti's Eighth Amendment conditions of

confinement claim that Warden Butricks has subjected Lenti to cold cell temperatures since his

transfer to Cheshire in September 2019; and Lenti's Eighth Amendment claim that he has been

subject to deliberate indifference to his rights under the Eighth Amendment based on the

unresponsiveness to his requests for medical treatment to help address (a) herniated discs, (b)

drop foot, and (c) bi-lateral carpal tunnel.  Lenti may pursue those claims in separate lawsuits.

Thus, the Clerk is instructed to **terminate the following parties** from this action:  (1) Dr.

Ricardo Ruiz, (2) Counselor Supervisor Carbone, (3) Officer Doe, and (4) Officer Cyr.

**(3)**      Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be

completed within **six months (180 days)** from the date of this order.  Discovery requests need

not be filed with the court.

**(4)**      All motions for summary judgment shall be filed within **seven months (210 days)**

from the date of this order.

**(5)**      The Clerk shall send a copy of the amended complaint, doc. no. 28, this court's

prior Initial Review Order, doc. no. 23, and this Order to the Connecticut Attorney General and

to the Department of Correction Legal Affairs Unit.

**(6)**      The Clerk shall enter the Standing Order Re: Initial Discovery concerning inmate

cases initiated by self-represented inmates and shall send a copy to Lenti.

SO ORDERED at Bridgeport, Connecticut this 24 day of July 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge